EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Public Corruption & Civil Rights Section
MAX B. SHINER (Cal. Bar No. 187125)
WILSON PARK (Cal. Bar No. 239527)
Assistant United States Attorneys
Violent & Organized Crime Section
    1300/1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/3308/5796
    Facsimile: (213) 894-6436/3713
    E-mail:   mack.jenkins@usdoj.gov
               max.shiner@usdoj.gov
               wilson.park@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-338(A)-SJO-15 |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION REGARDING PRESENTENCE REPORT FOR DEFENDANT JERMAINE HOUSTON; EXHIBITS A-J |
| v. | |
| TYRINE MARTINEZ, et al., [JERMAINE HOUSTON] | Sentencing Date: 11/8/16<br>Sentencing Time: 9:00 a.m. |
| Defendants. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California, hereby files its Government's Position Regarding Presentence Report for Defendant Jermaine Houston.

///

This Position is based on the files and records in this case, the attached Memorandum of Points and Authorities and attached exhibits, the Presentence Investigation Report, and any other further information that may be requested by the Court.

Dated: November 3, 2016         Respectfully submitted,

                                EILEEN M. DECKER
                                United States Attorney

                                LAWRENCE S. MIDDLETON
                                Assistant United States Attorney
                                Chief, Criminal Division


                                      /Mack E. Jenkins/
                                MACK E. JENKINS
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1
I.   INTRODUCTION..................................................1
II.  GUIDELINES CALCULATIONS.......................................2
     A.   PSR's Calculations.......................................2
     B.   Government's Objection to PSR............................3
          1.   Aggravating Role....................................3
          2.   Directing Violence..................................5
III. Government's Guidelines Calculations and Recommendations......7
IV.  RELEVANT EVIDENCE.............................................8
     A.   Defendant Is an Active and Vocal OG Broadway Crip Who
          Directs Violence, Particularly Against Informants, and
          Deals Drugs..............................................8
V.   SUPPORT FOR GOVERNMENT'S RECOMMENDATION.......................9
     A.   The Government's Recommended Sentence Is Substantially
          Below the Low-End of the Guidelines......................9
     B.   Relevant 18 U.S.C. § 3553(A) Factors.....................9
          1.   Mitigating and Other Factors.......................10
VI.  CONCLUSION...................................................12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

On June 27, 2016, defendant JERMAINE HOUSTON, also known as ("aka"), "J-Bone" ("defendant"), pled guilty to two of the four counts charged against him. (PSR ¶ 1.) Specifically, defendant pled to the following:

Count One, in violation of 18 U.S.C. § 1962(d) (RICO conspiracy), based on defendant's agreement to work with the Five Deuce Broadway Gangster Crips criminal street gang (the "Broadway Crips" or "BGC") to engage in racketeering activity, including crack cocaine trafficking. (PSR ¶ 2.)

Count Twelve, in violation of 18 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), based on defendant's participation in the Broadway Crips' drug trafficking conspiracy, including a conspiracy to distribute at least 28 grams of crack cocaine. (PSR ¶ 3.)

At sentencing, the government has agreed to dismiss Counts 64 and 66, which both charge violations of 21 U.S.C. § 860 (drug sales near protected locations). (PSR ¶ 11.)

With the exception of the below objections for the reasons stated below, the government concurs with the advisory United States Sentencing Guidelines ("Guidelines") calculations and factual findings, set forth in the United States Probation Office's ("USPO") Pre-Sentence Investigation Report ("PSR").

The government recommends that the Court sentence defendant to **87 months' (7.25 years') imprisonment**, followed by a **supervised release period of five years** with the parties' stipulated special conditions: (a) <u>that defendant not reside in Broadway Crips'</u>

territory[1] (b) that he be subject to search by any law enforcement entity, of his person, residence, vehicle, or cell phone, with reasonable suspicion, at any time. And defendant must pay a mandatory special assessment of $200. The government recommends the fines be waived.

## II. GUIDELINES CALCULATIONS

### A. PSR's Calculations

The USPO, in its PSR, submits the following Guidelines calculations in this matter:

| GUIDELINE | LEVEL |
|---|---|
| Base Offense Level:<br>RICO Conspiracy + Drug Trafficking Predicate<br>[USSG § 2E1.1]<br><br>Drug Trafficking Conspiracy:<br>At least 28g but less than 112g of crack cocaine<br>[USSG § 2D1.1(1)(c)(8)] | 24 |
| Distribution of Drugs In a Protected Location<br>[USSG § 2D1.1(a)(2)] | +1 |
| Acceptance of Responsibility<br>[USSG § 3E1.1(a)] | -3 |
| **TOTAL OFFENSE LEVEL** | **22** |

The USPO found a Total Offense Level of 22 and a Criminal History Category VI (17 points), which establishes a Guidelines range of 84-105 months' imprisonment. (PSR ¶¶ 57-59, 145.) There is a 60-

---

[1] Unless defendant is unable to find suitable housing outside of the BGC's territory and with written approval and verification from the USPO defendant would be permitted to reside with family members within BGC's territory. (Plea Agreement ¶ 2.)

month mandatory minimum custodial term due to defendant's Count 12 conviction for conspiring to distribute at least 28 grams of crack cocaine. (PSR ¶ 144.) Defendant faces a supervised release range of a minimum of 4 years and a maximum term of life (PSR ¶ 147)[2] and a fine range of $7,500 to $5,250,000. (PSR ¶ 154.) Defendant must pay a $200 special assessment. (PSR ¶ 153.) The USPO did not identify any factors that would warrant a guideline departure or variance. (PSR ¶¶ 113-14.) The USPO's recommendation is confidential.

**B. Government's Objection to PSR**

1. Aggravating Role

The PSR did not find any applicable role enhancement but appears to have applied the wrong standard. (PSR ¶ 54.) The PSR states "there is no evidence that Houston had a leadership role over another participant *with respect his drug distribution.*" (Id.) (emphasis added). This qualifier is erroneous and overlooks an abundance of dispositive evidence. Role enhancements do not solely apply to defendant's drug distribution;[3] the analysis equally applies to his role in the RICO conspiracy (Count One) to which he pled guilty. And the evidence of defendant's aggravating role with respect to the RICO conspiracy is substantial and unchallenged. The government's requested 3-level enhancement[4] applies where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]" USSG § 3B1.1(b). As the Ninth Circuit has explained,

---

[2] The PSR erroneously omits the maximum term.

[3] USSG § 3B1.1.

[4] If defendant was an "organizer or leader" a 4-level enhancement would apply. USSG § 3B1.1(a).

3

a defendant "need only exercise authority over one and not all of the other participants in order to merit the adjustment." United States v. Camper, 66 F.3d 229, 231 (9th. Cir. 1995).

First, in his plea agreement, defendant admitted that he was an "OG" (original gangster) of the Broadway Crips.[5] Such a title carries a tangible status and a resume of gang conduct that imbues an undeniable sense of power and leadership on its bearer. Second, defendant's conduct in this case confirms this assertion. On March 10, 2012, there was a well-attended[6] Broadway Crips gang meeting,[7] which included some of the gang's most violent and active members.[8] At this meeting, defendant expressly admitted that he "***provided instructions*** to the gang assembly." (PSR ¶ 26.) Tellingly, defendant was one of the select central speakers throughout this meeting.[9] Of note, the other central speaker at this meeting, defendant and fellow OG Tyrell Thomas Sr., admitted in his plea agreement that he was a manager/supervisor, which warranted a 3-level

---

[5] The Indictment alleges that OGs "are veteran members of the gang who are older and who have gained status within the gang through a variety of methods. In addition to being distinguished by their age, OGs include those who have 'put in work' on behalf of the gang and/or served custodial time, either of which fact increases the individual member's status within the gang." (Indictment at 11-12.)

[6] The meeting included "at least 35 members and associates of the Broadway Crips." (PSR ¶ 24.)

[7] The Indictment alleges that gang meetings themselves are "called by OGs and older [Gremlin Riderz]" who would, among other things, "convene and/or preside over gang meetings in order to discuss the gang's business." (Indictment at 14-15, 20.)

[8] The meeting included co-defendants Tyrell Thomas Sr. (#5), Charles Smith (#7), Lord Kelly (#8), Akia Pete (#11), and Derek Jones (#16). (PSR ¶ 26.)

[9] Exhibits A-J: Transcript Excerpts of 3/10/12 Gang Meeting. The transcript was created by FBI case agents after reviewing the recording and in consultation with sources present at the meeting.

role enhancement.[10]  This further supports the applicability of the same enhancement here.  Third, even more disturbingly, defendant admitted that, during this meeting at which he provided instruction to fellow significant Broadway Crips, he "discussed **killing informants**." (PSR ¶ 26.)  The transcripts from this meeting are irrefutable on this point.  (Exs. A-J.)  Indeed, this leadership enhancement is designed precisely for conduct like that captured in defendant's case.

### 2. Directing Violence

The PSR also erroneously omits the 2-level enhancement under USSG § 2D1.1(b)(2) for "direct[ing] the use of violence."  This is despite that there are recorded examples of defendant discussing and directing violence throughout the March 10 gang meeting.  Indeed, as stated above, defendant admitted that at the March 10 meeting, during which he was one of the keynote speakers and at which he "provided instructions" he "discussed **killing informants**."  (PSR ¶ 26.)

Further specific recorded examples include:

"Any ni**a ever brandish a gun on me . . . . **I'm a kill you**[.]"[11]

* * * *

HOUSTON: I'm. . . I'm. . . I'm. . . I'm like this here man. . . I'm like this. Ni**a. . . a ni**a. . . if a ni**a talkin' [cooperating][12] man. . . he. . . he's no good homie.

TT: Nah. . .

UM: Nobody. . .

---

[10] Plea Agreement of Tyrell Thomas Sr. at 17; CR 1890.

[11] Ex. E.

[12] Phrases in brackets are the government's interpretation based on conversation with Broadway Crips gang experts.

5

Case 2:14-cr-00338-DMG   Document 1940   Filed 11/03/16   Page 9 of 15   Page ID #:10796

TT: . . . he ain't no good around here. Nowhere else! He ain't good nowhere.

HOUSTON: Period man. You know what I'm saying? And. . . a. [UI] my ni**a. And I'm. . like a lot of sh*t need to be aired out though. Ain't no more hiding sh*t man. You foul, you foul. And you foul, you getting' the fu*k up out of here!

UM: So what you do wit a snitch? [UI]

HOUSTON: **You already know what to do with a snitch.** Don't ask a stupid question. That's a dumbass question. **If you bout your business**. . . it is about. . . it is a dumb question. Let me tell. . . let me tell you why it's a dumb question my ni**a. I'm. . . I'm say it not in a disrespectful way though. It. . . it. . . **it's a dumb question because you know you're suppose to do anyway**.

TT: Really it is. [UI] snitchin'.

HOUSTON: What's **a green light my ni**a? Green. . . go**. Red light means stop my ni**a. What. . . what. . . what you want me to tell you? You know I mean?[13]

****

HOUSTON: But if it's your homie. He ain't never gonna do shit like that [cooperate]. If it's your homie, know what I'm saying?

AP: That ni**a ain't my homie cuz.

HOUSTON: Okay. Well then ya'll need. . . well then. . . you need to take that up with him then.

AP: I already told you. . . ni**a ain't my homie.

HOUSTON: **Ya'll need to handle that business then**. [Assault/Kill cooperator.] **Something needs to happen then** [to the cooperator].

UM: Yeah.

HOUSTON: **Something needs to happen**. Bottom line.[14]

****

HOUSTON [regarding gang members who had been cooperated against]: "I don't give a fu*k who it is so . . . . But whatever took place or whoever was here at the time, **they**

---

[13] Ex. F.

[14] Ex. G.

6

*supposed to handle they business* [referring to committing violence against informants].[15]

\*\*\*\*

HOUSTON: [I]t's a different crowd of mutha fu\*kas man… young ni\*\*as man . . . **they supposed to be out here man on daily my ni\*\*a, for real for real, man protecting this mutha fu\*ka** man . . . ni\*\*as is slacking[.][16]

If this enhancement does not apply to an OG gang leader defendant directing, on recording, younger gang members to kill and assault informants and to use violence to protect their gang territory, it is difficult to conceive when such an enhancement would ever apply.

**III. Government's Guidelines Calculations and Recommendations**

With the exception of the above two objections for the PSR's failure to include established enhancements, the government concurs in the remaining Guidelines calculations and factual findings in the PSR. With this enhancement, defendant's Total Offense Level is 27,[17] which makes defendant's proper Guidelines range 130-162 months' imprisonment. The government recommends the sentence as agreed to in the plea agreement, namely, 87 months' imprisonment.[18] The government further recommends 5 years of supervised release, a $200 special assessment, and that all fines be waived.

Further, also pursuant to the plea agreement, the government moves to dismiss the sole count of the 21 U.S.C. § 851 Information charged against defendant. (PSR ¶¶ 5, 9.) Defendant agrees to waive his right to appeal provided the Court imposes a total term of

---

[15] Ex. H.

[16] Ex. I.

[17] PSR's finding of 22 + 3 (aggravating role) + 2 (directing violence) = Total Offense Level 27.

[18] PSR ¶ 9(c).

imprisonment on all counts of conviction of no more than 105 months. (Plea Agreement ¶ 24.)[19]

## IV. RELEVANT EVIDENCE

### A. Defendant Is an Active and Vocal OG Broadway Crip Who Directs Violence, Particularly Against Informants, and Deals Drugs

A general summary of defendant's specific racketeering conduct is set forth in the Plea Agreement and the PSR. (PSR ¶¶ 14-34; Plea Agreement ¶ 21(a)-(s).) In sum, defendant is a longtime OG Broadway Crip who, after being sentenced to 168 months in prison for his role in the Broadway Crips interstate cocaine trafficking network, almost immediately returned to his gang to capitalize on his criminal pedigree. (PSR ¶¶ 20-34, 74.) In furtherance of his gang membership, defendant took on a leadership role, including by being a central speaker at a meeting and organizing the gang's Hood Day; he discussed "killing informants;" he directed younger gang members to protect the gang's territory with violence; he boasted of his willingness to kill fellow gang members who confronted him; and he directed how gang business was to be conducted. (Exs. A-J.)

After being released from federal prison and while on federal supervised release, defendant also sold crack cocaine and possessed an assortment of prescription drugs for sale, including near schools. (PSR ¶¶ 27, 28, 30.) Defendant also repeatedly violated the terms of his supervised release in other ways, including by being arrested for assault with a deadly weapon, disturbing the peace, being charged

---

[19] The plea agreement stated defendant would waive certain appellate rights provided the Court imposed a sentence of no more than the high-end of the Guidelines corresponding with a total offense level of 22 and the Criminal History Category found by the Court, which, per the PSR, is VI. (Plea Agreement ¶ 24; PSR ¶ 83.)

8

with domestic violence, driving on a suspended license, none of which led the USPO to seek additional custody time. (PSR ¶ 74.)

In furtherance of the RICO and drug trafficking conspiracies, defendant also was "aware BGC members would carry firearms for the purpose of assaulting others and protecting themselves and other BGC members from rival gang members and drug dealers" and that the Gremlin Riderz would urge younger members to "engage in violence" on behalf of the gang. (PSR ¶ 17.)

**V.  SUPPORT FOR GOVERNMENT'S RECOMMENDATION**

**A.  The Government's Recommended Sentence Is Substantially Below the Low-End of the Guidelines**

Because of defendant's instant convictions he faces a mandatory minimum term of imprisonment of 60 months' imprisonment and a mandatory minimum 4 years of supervised release. (PSR ¶¶ 144, 147.) A sentence of 87 months' imprisonment is barely half of the high-end of the government's calculated range (130-162 months) and essentially the low-end of the PSR's calculated range (84-105 months). It is also barely half of the term of imprisonment (168 months) imposed by the district court in Minnesota after defendant's prior federal conviction.

**B.  Relevant 18 U.S.C. § 3553(A) Factors**

The government's recommended sentence is supported by the factors set forth in 18 U.S.C. § 3553(a), both aggravating and mitigating, as set forth in the Indictment, the PSR, and defendant's plea agreement. First, defendant, who in just 1999 was sentenced to 14 years in federal prison for his role in a sophisticated BGC trafficking ring, admitted a longtime and active membership in a violent and deadly criminal enterprise that has terrorized and held

hostage a vulnerable population for decades. Next, as part of his admitted RICO conduct, defendant established a position of prominence within the gang; directed fellow BGC members to expel and commit violence against those who would attempt to escape the gang and provide helpful information to law enforcement; tried to enhance the gang's stranglehold on the community it inhabited; and orchestrated celebrations of their gang lifestyle. (Exs. A-J.) Defendant was also on multiple forms of court supervision at the time he committed the instant offenses. (PSR ¶ 82.)

In addition to specific deterrence of defendant from committing future crimes, <u>general</u> deterrence of fellow and future gang members is also of paramount importance in fashioning a meaningful sentence. As sagely stated by a co-defendant's counsel regarding the co-defendant's sentencing in this matter:

> when others in the local community see that [defendant] receives a . . . [significant sentence] from the Federal Court for being a gang member with all of its concomitant activity, such as dealing drugs, exhibiting gang solidarity by attending a funeral and a "Hood Day," . . . and packing around a firearm, such a sentence will send a message to all youngsters contemplating gang membership that they better respect the law.

(Sentencing Position of Cedric Johnson; Clerk's Record 1154 at 8.) The government wholeheartedly concurs.

### 1. Mitigating and Other Factors

Defendant does have mitigating factors. Like many minority youth in inner-city Los Angeles, defendant grew up in a low-income household near where gangs, like his own Broadway Gangster Crips, infested and influenced the neighborhood. (PSR ¶ 103.) For a long time, defendant was fatherless and raised predominantly by his young working single mother. (PSR ¶¶ 101-02.) Defendant now has five

10

"great children" of his own with whom he claims a good relationship. (PSR ¶¶ 106-111.)

Defendant, an elder statesman of the gang at 43, has abused drugs, including cocaine and ecstasy, for an extended period of time. (PSR ¶¶ 121-126.) Defendant stopped attending school after the 11th grade in order to "hang out with his peers." (PSR ¶ 127.) Unlike the majority of defendants in this case, defendant has repeatedly and apparently successfully made efforts at employment. (PSR ¶¶ 131-139) (although many were inside custodial facilities). Further, since 2014, defendant has been taking business classes and majoring in business through Coastline Community College. (PSR ¶ 129.)

The government asserts that its plea agreement and recommended sentence incorporates all of these factors. The government provided a favorable plea agreement to defendant, largely because of his agreement to resolve his case early and admit all relevant facts. This plea agreement offers significant benefits to defendant. Namely, the government agreed to dismiss: the § 851 enhancement that could have doubled defendant's mandatory minimum sentence. The government also did not require defendant to admit to several Guideline enhancements supported by the evidence. Finally, the recommended sentence is also substantially below the low-end of the applicable Guidelines.

In sum, defendant's sentence must reflect the seriousness of defendant's continued racketeering offenses and the legacy of devastation they leave in their wake. Further, the sentence must be aimed at disrupting the same cycle of criminality and gang dominance that now threatens to engulf defendant's five children who, because of defendant's choices, have also grown/will also grow up largely

fatherless in suffering South Los Angeles.  Finally, defendant and his fellow gang members must see a federal conviction not as a badge of perverse gang honor to be flaunted to increase one's criminal status but as a critical crossroads to choose the gang life or the life of community and family.

**VI. CONCLUSION**

For the foregoing reasons, the government respectfully requests the Court sentence defendant JERMAINE HOUSTON, aka "J-Bone," as recommended above, namely:

- 87 months' (7.25 years') imprisonment;
- 5 years' supervised release, with special conditions:
    - Gang territory residence restriction;
    - Search conditions;
- $200 special assessment; and
- Fines waived.