# Exhibit A

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                        )
6                    Plaintiff,         )
                                        )              Case No.
7        vs.                           )        CR 14-00338 SJO
                                        )
8   ROBERT CURTIS BARNETT,             )
                                        )
9                    Defendants.        )
    _____ )

10

11

12              REPORTER'S TRANSCRIPT OF
                      SENTENCING
13           MONDAY, DECEMBER 12, 2016
                      9:43 A.M.
14            LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23         CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
              FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 414
              LOS ANGELES, CALIFORNIA 90012
25                   (213) 894-3539

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        EILEEN DECKER
         United States Attorney
5        BY:   MAX B. SHINER
               Assistant United States Attorney
6        United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         (213) 894-3308

8

9    **FOR THE DEFENDANT:**

10       CHERNIS LAW GROUP
         BY:   MICHAEL S. CHERNIS
11             Attorney at Law
         2425 Olympic Boulevard, Suite 4000
12       Santa Monica, California 90404
         (310) 566-4388

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 12, 2016

 2                           9:43 A.M.

 3                           --oOo--

 4         THE COURTROOM DEPUTY:  Calling Item No. 9:

 5   Case number CR 14-00338 SJO; United States of America versus

 6   (Defendant No. 29) Robert Curtis Barnett.

 7         Counsel, please state your appearances.

 8         MR. SHINER:  Good morning, Your Honor.  Max Shiner

 9   appearing for the United States.  Also present at counsel table

10   is FBI special agent Ross Hansberger, H-a-n-s-b-e-r-g-e-r.

11         MR. CHERNIS:  Good morning, Your Honor.  Michael

12   Chernis here with Mr. Barnett, who is in custody.

13         THE COURT:  Mr. Barnett is here in custody.

14         The matter is here for purposes of sentencing.  So, again,

15   the Court has reviewed the plea agreement in the case.  The

16   Court has reviewed the presentence investigation report of

17   September 26, 2016; the confidential letter to the Court dated

18   September 19th, 2016.  The Court has reviewed the Government's

19   underseal sentencing exhibits that were filed November 29th,

20   2016.

21         The Court has reviewed the Government's pleading regarding

22   sentencing.  The Government concurs with the PSR sentencing

23   calculation.  The Government has certain objections to factual

24   findings in the PSR.  The Government has the base level to be

25   24.  There's an adjustment for possession of a firearm, a
```

1    plus 2.  The defendant qualifies as a career offender.  That's

2    the Government's position.  There is -- which raises the

3    offense level to 34.

4        The defendant has accepted responsibility.  There should

5    be an adjustment for 3 levels for acceptance of responsibility.

6    So the total offense level becomes 31, not 32.  And the

7    Government again agrees that the defendant qualifies as a

8    career offender.  And as a result for his career offender

9    status, his Criminal History Category is VI, the guideline

10   range is 210 to 262 months.

11       There is a 60-month minimum -- a 60-month mandatory

12   minimum penalty as to Count Twelve.  The Government, applying

13   the 3553 factors, has recommended a sentence of 105 months,

14   5 years supervised release.

15       The Court has reviewed Mr. Chernis's pleading, and we have

16   a second pleading that was filed by Mr. Chernis on December 9.

17   In the pleading Mr. Chernis moves the Court for a 70-month

18   sentence followed by a period of supervised release.

19       There's an objection on behalf of Mr. Barnett to certain

20   findings in the PSR, particularly the finding that he qualifies

21   as a career offender.  The defendant -- or counsel believes

22   that the defendant's criminal history is also overstated and

23   requests that the Court sentence him as a person or someone

24   with a Criminal History Category of IV.

25       In reference to the criminal history calculation and

 1   career offender status, there's a claim, as I understand it, of

 2   three errors:   One, the first is that the probation officer

 3   determined that there should be 1 point for a juvenile

 4   adjudication for vandalism.   That was reflected in paragraph

 5   56.   There's an objection to the 2 points for a 2011 driving

 6   with a suspended license.   The claim here is that a 2-point

 7   adjustment is excessive.   And the final claim is that the

 8   probation officer erroneously attributes or calculated 2 points

 9   for a drug felony possession.   So based on all of the errors

10   and on a 3553 analysis, Counsel moves for a sentence of 70

11   months.

12        The Court has reviewed the addendum to the presentence

13   investigation report, which addresses the Government's -- the

14   Government has regularly objected, raised similar objections in

15   all of these cases involving this indictment.   The concern that

16   the Government has is that the probation officer or probation

17   office fails to reference that the statutory maximum for

18   Count Twelve is life.

19        The Court has reviewed the second letter of recommendation

20   to the Court dated -- by the probation officer with a December

21   6, 2016 date, and the Court has reviewed the revised

22   presentence investigation report, and was revised on December

23   7th.   And then I have this morning a supplemental position

24   sentencing pleading filed by Mr. Chernis, which I have not

25   reviewed.

1    So one of the problems in the case is that the probation

2 officer was not able to revise the presentence investigation

3 report and address the objections of the defendant and counsel

4 for the Government until December 7th.

5         MR. CHERNIS:  Your Honor?

6         THE COURT:  Yes.

7         MR. CHERNIS:  I apologize for the late filing.

8         THE COURT:  I don't think it's late because -- I

9 don't think it's late.  I haven't read it yet because of the

10 revision.  It's hard to respond quickly.

11         MR. CHERNIS:  I know that you have a full docket

12 today, but I would -- I would like for you to have the

13 opportunity to review that supplemental filing, and in

14 particular a letter that we attached to it from Mr. Barnett's

15 mother.  The supplemental filing will simplify the issue of

16 objections because the PSR resolved all but one of our

17 objections.  But the most important thing, frankly, I think, is

18 the letter from Mr. Barnett's mother.

19         THE COURT:  Well --

20         MR. CHERNIS:  I can summarize for you the

21 objections, but I thought that letter and also a letter from

22 his fiancee are quite compelling, and we put it all together in

23 the same file.

24         THE COURT:  Yes.  Look, that being said, I'm always

25 open to carefully considering letters from family members.  I

think sentencing is very complex.  People come into court or
defendants come into court involving indictments where the
conduct is serious and at some times horrific.  This is a case
where the conduct of the defendants is particularly pernicious,
long-lasting, involving allegations of distribution of large
amounts of controlled substances, asserting control over
certain parts of the city causing violence and harm to other
gang members, members of the gang for discipline reasons, and
then totally innocent persons.

In this particular case, we had a defendant that, I think,
is a career offender.  He qualifies as a career offender.  His
career offender status places him in an advisory guideline
range of 210 to 262 months.

The Government in this case is moving for a sentence of
105 months and 5 years supervised release.  There's a minimum
mandatory sentence of 60 months as follows, and counsel is
moving for a sentence of 70 months.  I don't know what a letter
that would be, I'm assuming, very compelling would do because
he has been given the benefit of all doubt by the Government.

MR. CHERNIS:  Well, it's not necessarily true,
Your Honor.  First of all --

THE COURT:  Let me review the document first.

MR. CHERNIS:  The Government in its opposition, in
its sentencing memorandum, challenged the veracity of certain
claims that Mr. Barnett and I were making concerning his

1  childhood.

2        THE COURT:  I recognize that it's not just your

3  client, but I think I have 70 of the defendants indicted in the

4  one indictment.  I have presided over several sentencing

5  matters, and I can tell you from the number of defendants who

6  appeared in the Court, the life that many of them have lived is

7  horrific, starting at the earliest of ages.  So I recognize

8  that those are significant factors.

9        That being said, you know, just review the history of the

10  defendant.  There's -- it dates back to age 13.

11        MR. CHERNIS:  Your Honor, I just have to focus the

12  Court, because if you haven't had the benefit of looking at our

13  supplemental memorandum, I took issue in particular -- first of

14  all, some of the information that you cited at the outset

15  respectfully is -- is inconsistent with the revised PSR.

16        The revised PSR, number one, agreed with an objection that

17  we made to a criminal history point, reduced the total criminal

18  history points from 11 to 10.  That's because a 2012 possession

19  offense, which was incorrectly referenced in the PSR as a sales

20  offense, was reduced from 2 points to 1 point.

21        In addition, because the Government has now agreed to move

22  for 3 points for acceptance of responsibility, it reduces not

23  only the career offender guideline from a 200-plus number down

24  to 188.  The correct career offender range is now 188 to 235,

25  and the correct range, if we ignore career offender, is now 84

1    to 105.  Your Honor had said something earlier about a 200

2    number.  That was the number --

3                THE COURT:  That was prior to, prior to the

4    revision.

5                MR. CHERNIS:  I'm just making sure we are operating

6    off the same script.

7                THE COURT:  Right.

8                MR. CHERNIS:  The other thing, though, Your Honor,

9    is that in the Government's position -- and the reason I

10   reference the letter from Mr. Barnett's mother, the Government

11   has sought to portray Mr. Barnett as having a much more

12   significant criminal history and, in particular, a much more

13   significant history of violence than he has.  And they

14   erroneously reference his involvement in an act in 2013, which

15   I'm prepared to demonstrate is completely wrong.

16       In addition to that, they basically said that he was

17   exaggerating his terrible upbringing, which necessitated me

18   going to his mother to get a letter to straighten things out.

19   So while we all agree it's important their background and

20   childhood disadvantages, for the Government to actually suggest

21   he is conflating it and exaggerating it was really the thing I

22   thought I had to respond to, Your Honor.

23                THE COURT:  I just don't see a sentence of 70 months

24   by any measure.

25                MR. CHERNIS:  Your Honor, can I -- well, I know from

1   prior sentences, Your Honor, in this case that I watched, that

2   Your Honor does pay particular attention to how these gentlemen

3   ended up and the life they ended up in.  I know I heard you say

4   with other defendants that, you know, the variance was

5   appropriate because of disadvantaged youth and that kind of

6   thing.  And I would submit to Your Honor, there could be no

7   situation where a variance would be appropriate for history and

8   circumstances of upbringing more appropriate than in this case.

9       And I know in probably every case with a gang member

10   defendant -- plus defense lawyers are making these pitches to

11   the Court -- but the reality is that the facts here,

12   Your Honor, are really more compelling than I have seen in

13   other cases.

14       You have Mr. Barnett was born to a mother who was a

15   fugitive from the law.  She is a self-admitted prostitute,

16   thief and drug dealer.  Mr. Barnett was abandoned by his father

17   at age two and left at the doorstep of his grandparents because

18   his mother was in jail.  He was taught and forced to steal by

19   his mother's boyfriend, who was a convicted felon and multiple-

20   home invasion robber.  He was physically abused consistently,

21   repeatedly --

22           THE COURT:  Sir, I'm not contesting that.  I

23   presided over a death penalty case years ago where the mother

24   of the defendant in the penalty phase would not come to court

25   and ask the jury to save her son's life.  I've seen it.  I've

1  heard it.  I accept that your client came from -- had a

2  background that was horrific and presented many challenges.

3       MR. CHERNIS:  Well, I would submit, Your Honor, if

4  it matters at all, then it matters in this case.  I haven't had

5  cases before like that, Your Honor, but I also haven't had

6  cases before where the parents are having the child dive

7  through dumpsters to get spare food and boxes that can be sold

8  or teaching them to steal from Rite Aid so they can sell

9  medicine on the street.

10      Apart from that, as a mitigation factor, I want to clarify

11  for the Court two issues, Your Honor:  One is our asserted

12  position on overstatement of criminal history; and the other is

13  the disparity issue, because a couple of different things have

14  been said by the Government and in the PSRs that are not

15  exactly on point.  And now with the benefit of the revised PSR,

16  it should be much clearer.

17      Mr. Barnett has 10 criminal history points, Your Honor.

18  As the Court knows, 9 criminal history points is the cutoff to

19  be in category IV, so he obviously has one more point than he

20  would than if he was in IV.  There are 3 points in play,

21  Your Honor, that I think merit closer attention:  2 points for

22  a suspended license violation; 1 point for a juvenile vandalism

23  offense.

24      The juvenile vandalism offense, Your Honor, had nothing to

25  do with drugs, had nothing to do with gangs, had nothing to do

 1   with violence.  He was 13 years old.  It was before he was even

 2   in a gang.  He got 1 criminal history point for that because of

 3   a very technical and arcane rule in the guidelines that says if

 4   you commit a juvenile offense within five years of your

 5   criminal history -- your criminal conduct, it gets applied.

 6   His vandalism offense was four years from his first RICO

 7   conduct.

 8        If the Court was to disregard that one juvenile offense,

 9   he has 9 points.  He's at the high end of category IV.

10   Otherwise, Your Honor, he's got 5 criminal history points

11   related to either violent or drug convictions, only 5.  That's

12   the essence of our overstatement argument.  We just want the

13   Court to take a closer look, maybe disregarding that 1 criminal

14   history point from that juvenile offense.

15        The other point I want to make, Your Honor, on this whole

16   issue, you started talking about this gang and its pernicious

17   conduct, which is all true.  The reality, though, is it's not

18   true with respect to Mr. Barnett.  He has one conviction,

19   Your Honor, one, that involves violence.  It happened in 19 --

20   excuse me, it happened in 2006, ten years ago.  He was the

21   driver of a car when two other gang members got out of the car

22   and fired shots at two different gang members from a rival

23   gang.  He was the driver.  He was 18 years old.  He was not the

24   shooter.

25        That's it, Your Honor.  That's his violent history.  The

Government in its opposition put together some story about how

he also was bringing guns to another confrontation of rival

gang members in 2013, but they got the wrong guy.  There's

another gang member who they are referring to named Beetle or

Little Pony.  And I can demonstrate to the Court, if it really

wants to see, that they mistook my client for this other guy

Beetle.

So what you are left with, Your Honor, is one criminal act

of violence in 2006.  And I've heard the Court say when a

defendant doesn't show a pattern of violent conduct and there's

been a long lapse in time, that's significant.  It's been 10

years since he did anything associated with violence.

There's no -- there's no evidence, Your Honor, that my

client ever possessed or used firearms.  That really separates

him from just about every defendant in this case.  He agreed to

a 2-point enhancement for a firearm possession, but that was

based on the possession of a firearm by other gang members in

the gang, not him.

So there's no evidence of a pattern of violence.  There's

no evidence of use of firearms, and these are very significant,

distinguishing factors from other defendants.  As far as why a

sentence of 70 months for somebody who is a career offender,

Your Honor, he technically meets the definition of career

offender.  We can't get around that.

But if I look at the sentences that Your Honor has imposed

1   on other defendants in this case, two of whom are career

2   offenders, a sentence of 105 months, which the Government is

3   seeking, frankly the Government is asking for a sentencing

4   disparity.  It can't be justified given the sentences given to

5   other defendants in this case.

6        If I look at Anthony Cole, who Your Honor sentenced to 60

7   months, his guideline range was 92 to 115 months, he got a

8   32-month downward variance.  He had a higher criminal history

9   point, total of 20.

10            THE COURT:  Look, there's 70 here.  We can go

11  through each one.

12            MR. CHERNIS:  Your Honor, I have given you data on

13  all of the other defendants that fall within the same bandwidth

14  of Mr. Barnett as far as what he's done.  Certainly anyone

15  that's gotten more than 84 months, Your Honor, has a pattern of

16  violence that he doesn't have:  they shot at people, they

17  robbed people, they beat up girlfriends.

18            THE COURT:  Other than the fact that he was the

19  driver of a vehicle where two other gang members shot at

20  people.  Other than the fact that in his factual basis he

21  stipulates to being involved with other gang members who were

22  in possession of a handgun and at a residence where there was a

23  9-millimeter handgun.

24            MR. CHERNIS:  Your Honor, he was found in a

25  residence with three other gang members.

1          THE COURT:  Yes.

2          MR. CHERNIS:  And two of the other gang members had

3   guns, yes, but all the guys in the gang you can say that about.

4   But what makes him different, he's not shooting at people.

5   He's not beating up people.

6          THE COURT:  He's just driving people who shoot

7   others.

8          MR. CHERNIS:  Your Honor, that happened 10 years ago

9   when he was 18 years old.

10          THE COURT:  It's still serious, though.

11          MR. CHERNIS:  Of course it is, Your Honor.  If we

12   look at the other two people --

13          THE COURT:  Look, what do you want me to do?  Do you

14   want me to read the letter?  I will do that.  We can put the

15   matter over.  The arguments you're making today, I think, are

16   arguments that are valid arguments, but ultimately they appear

17   to have been taken into consideration by the Government in

18   recommending a sentence that is well below the guideline range.

19          MR. CHERNIS:  No, they haven't, Your Honor.  The

20   Government has been trying throughout the course of this case

21   to portray my client as somebody different than he is.  He's

22   been portrayed as somebody with a pattern of violence.  I don't

23   know how the Government can justify asking for 105 months when

24   they have asked for sentences of much less for people with much

25   worse records.

1        I mean, Your Honor doesn't want me to go through it, but I

2   can give you the data points on the other defendants in this

3   case who have much more severe records of violence who the

4   Court sentenced to 72 months, 84 months.

5            THE COURT:  We just see things differently.  I don't

6   know what to say.

7            MR. CHERNIS:  Your Honor, but the Government --

8            THE COURT:  What do you want to do today?  You have

9   a limited time to argue, and if you want more time, you can

10  have more time, but not at this juncture.

11           MR. CHERNIS:  Your Honor, I have said my spiel.  My

12  main point is that I'm concerned that the Court is viewing

13  Mr. Barnett through the lens of what the Government has

14  presented, which is factually false.  It's false, Your Honor.

15  He has one act of violence, not a pattern of violence.

16           THE COURT:  I regularly -- let's put this case

17  aside, but I have, on many occasions, disagreed with the

18  Government's sentencing on a number of times:  in certain cases

19  it was far too lenient, and in certain cases excessive.  So

20  again, at the end of the day, sentencing's up to the Court, and

21  the Court has to take into consideration all of the issues.

22  Again, we start with the minimum mandatory in this case is 60

23  months.

24           MR. CHERNIS:  Right.

25           THE COURT:  Yes.  So it's 5 years minimum mandatory.

```
 1    And then we look at all of the other conduct that he's

 2    stipulated to in the factual basis.  We look at his entire

 3    record and history, I recognize the difficult nature of his

 4    upbringing.  Difficult understates it.  It was a horrific

 5    upbringing, but others have faced that also.

 6                MR. CHERNIS:  Right, Your Honor, and others have --

 7    others who have gotten --

 8                THE COURT:  And the Court's concern at the end of

 9    the day is weapons and guns and violence.

10                MR. CHERNIS:  Right.  I'm trying to emphasize to the

11    Court that Mr. Barnett has not used and possessed --

12                THE COURT:  Was he a member of the Gremlin Riders?

13                MR. CHERNIS:  Yes, he was, Your Honor.

14                THE COURT:  And the important part of that is what?

15                MR. CHERNIS:  I don't know, Your Honor.  I know

16    other members of the Gremlin Riders had agreed to directing

17    violence by others.

18                THE COURT:  Yes.

19                MR. CHERNIS:  Others were given 2-point enhancements

20    for doing that.  That was not Mr. Barnett.  Even the Government

21    didn't move for a 2-point enhancement for that.

22                THE COURT:  Let me take a look at your supplemental

23    pleading here.

24         Mr. Shiner, do you have any comments?

25                MR. SHINER:  I do, Your Honor.  Thank you.  And I
```

**UNITED STATES DISTRICT COURT**

know you have a full calendar and a trial.  Believe me, I'm on
the calendar; I'm preparing for trial.  I don't want to take
too much time, but I can't recall a time in my eight years as
an AUSA where I have been the subject of so many allegations
that I've misrepresented facts and misrepresented to the Court
the defendant's role in the case, so I'm going to address those
things.

As you can see from that supplemental pleading, there are
several allegations that the Government misstated in the PSR
and misled the Court.  None of that is accurate.  For example,
defense says that the Government said -- that misled the Court
in saying that the PSR did not identify downward departures or
variances.

Paragraph 33, the probation officer has not identified any
factors that would warrant a departure from the applicable
sentencing guideline range.  Paragraph 37, the probation
officer has not identified any factors that would warrant a
recommendation from a variance outside of the advisory
guidelines range.  I quoted from the PSR, and the defense is
construing that as mischaracterizing and misleading despite the
fact that he objected to the PSR.  The PSR was revised in
detail, and a detailed addendum addressing those specific facts
was issued and provided to the Court.

Next, the defendant claims that the Government is
mischaracterizing defendant's mother's statements about his

childhood.  It's clear in the PSR that the defendant claimed

that he had a long history of abuse and, quote, paragraph 89,

Defendant and his brother were often physically abused by

James, his father -- a stepfather who beat him over a misplaced

$20 bill.  His mother stated in that PSR -- with respect to

Barnett's characterization of being beaten for a misplaced $20

bill, his mother indicated that Barnett was only punished for

taking money from her purse that she had saved to pay the

utility bills, so he could purchase expensive clothing for

himself.

Is it within bounds for the Government to point out what

the mother is saying about his claims of physical abuse?  I

believe it is.  It is not mischaracterizing.  The Government,

as this Court knows, places in its briefs a section on

mitigating evidence.  I don't see an aggravating section in the

defendants's briefs.  We balance that with what is actually in

the PSR.

And when the defendant comes and says that is

mischaracterizing because he went out and got a supplemental

letter from the mother now claiming that he was abused over a

course of five years, which, frankly, differs from what she

told the probation office, it is not a mischaracterization.

So with that in mind, I will talk about what the defendant

claims are the factual mischaracterization about his own

violent conduct and the pattern of violence, and I will start

1    with what the Government submitted as exhibits to its

2    sentencing position regarding the 2013 -- what I refer to as an

3    assault mission.  Defense thinks that it mischaracterizes and

4    gets it wrong.  The Government doesn't characterize what

5    happened there.  The Government supplies the line sheets to the

6    Court as exhibits so the Court could read it for itself.

7        And those line sheets state that Tyrine Martinez, not

8    defendant, went to retaliate for this confrontation with

9    East Coast Crips gang members.  That defendant Tyrine Martinez,

10   the leader of the Gremlin Riders, sought guns.  It's clear in

11   the line sheets that he did that.  He asks Keefe Dashiell for a

12   gat or for a tool.  Keefe Dashiell said he doesn't have one.

13   He asks Roosevelt Sumpter for a gat.  Roosevelt Sumpter says,

14   "I don't have one.  I gave mine to Beetle.  Beetle is the

15   person who is bringing the gun."

16       It is not our allegation that this defendant is the person

17   bringing the gun.  It is our allegation that he went with

18   Tyrine Martinez to retaliate against East Coast Crips gang

19   members.  It's clearly his name BA, Baby Ang, that Tyrine

20   Martinez twice says "is here with me.  He drove down here with

21   me."  There's no claim that Beetle is the same person as Baby

22   Ang.

23       One of those constants is in common, and I can bring the

24   calls in.  Defendant has had them since the onset of this case.

25   He's requested them from me.  They are in his possession.  I

```
 1   provided the line sheets with the session numbers to the Court
 2   and counsel.  This has nothing to do with mischaracterization.
 3   It frankly puzzles me as how it can be seen as such.  But
 4   moreover, whether there is a pattern of criminal acts, violent
 5   criminal acts is clear.  Defendant wants to claim he is just a
 6   person in a car.
 7        What he's saying is that what happened is that he went
 8   with Tyrine Martinez, fellow Gremlin Rider, leader of the
 9   Gremlin Riders gang, to confront rival gang members.  Tyrine
10   Martinez asked for guns.  He wants you to believe that he had
11   no knowledge of that, that he had no reason to think that it
12   would result in an outburst of violence.  I never said that
13   they found those people and that they fired guns at them.
14   That's beside the point.
15        The point is that he participated in the Gremlin Riders as
16   one of their violent enforcers.  Defendant makes similar
17   arguments about his 2006 assault, which I think the Court
18   recognizes that he was simply a driver, where two other gang
19   members jumped out of the car, but that fails to tell the whole
20   story.
21        The Court has the underseal witness statement.  The
22   witness statement says he was the witness that pled guilty to
23   this, admitted this in front of this Court he was one of the
24   shooters.  Keaton was one of the other shooters.  They went out
25   on a mission to specifically shoot at East Coast Crips gang
```

members.

When he did that, he shot at a group of gang members, and then they got back in the car -- or they traveled to another location where they got out of a car and shot at another group of what they thought was East Coast Crips gang members. They were wrong both times. But I fail to see how this defendant sees how his role in that was mitigating. He was the driver. He was the one taking them to the locations. And not only that, once he saw them shoot at one group, he took them to a location to shoot at another.

So we do have a pattern. We have a pattern of him acting just as we know the Gremlin Riders act: shooting at rivals, being violent. In fact, defense wants to compare this case to the cases of many other co-defendants. And I can say right now that other co-defendants regarded as violent -- the fact that he got a plea agreement with 105 -- or a sentencing position with a 105-month recommendation has come up in conversation with other defendants because they think, "I don't understand why he got 105." They've told me that on two separate occasions with two different people.

So not only is there a pattern of violence, but there is this disturbing trend both in his sentencing position, his supplemental pleading, which you have before you, and here in court today where he's claiming that -- he's essentially denying responsibility for his conduct in ways that are absurd

```
1   and go against the way the facts actually present themselves.

2       Defendant claims that -- frankly, he asserts his innocence

3   in the 2006 shooting.  He says that in his sentencing position.

4           MR. CHERNIS:  That's not true, Your Honor.

5           MR. SHINER:  He says that in his sentencing

6   position.

7           MR. CHERNIS:  That's just not true.

8           THE COURT:  Would you let counsel finish, please.

9           MR. SHINER:  Page 21 of his sentencing position,

10  that Mr. Barnett contends he pled guilty to the 2006 assault

11  despite his innocence and to avoid harsher consequences is

12  beside the point.

13          MR. CHERNIS:  Where is that?

14          MR. SHINER:  Page 21, Counsel.

15      I assert that it is the point.  The facts of that case are

16  not in dispute, and that defendant continues to contest them

17  despite his guilty plea is, frankly, baffling.  What happened

18  in that case, according to his own co-conspirator who pled

19  guilty, Mr. Keaton, who also pled guilty, that they went, they

20  did those shootings, they came back, they dumped the car.

21      And defendant was arrested with Mr. Keaton, identified by

22  two separate witnesses, independent witnesses, witnesses to one

23  shooting and witness to the other shooting as the driver.  He

24  was arrested a block, maybe a block and a half, where the car

25  used in the shooting was found burning to destroy the evidence.
```

That car was stolen earlier that day.  Defendant, who was
supposedly a driver of the car, identified by two people as the
driver of the car, identified to be the driver, had the shaved
key in his pocket.  Defendant now claims he was not involved in
that and he is factually innocent.

I find that contention to be absurd.  And the defense
claiming that the Government saying that is true is somehow
wrong.  The Court can't consider it?  I don't know.  Because he
didn't admit it in his plea agreement?  It is a part of his
racketeering conduct as alleged in the indictment, and he's
continued that pattern throughout his career.

His criminal history score is not underrepresented.  Even
his vandalism conviction should be counted, because what
defense doesn't seem to understand is that this offense is an
offense that lasted for 11 years.  It began at least in 2005.
He's being charged with racketeering conspiracy that was
ongoing since that date.  In other words, he led a life of
crime with the Broadway Gangster Crips and the Gremlin Riders.

Given what I have heard here today, there has been some
controversy whether the defendant has accepted responsibility.
I have moved for the third point, but frankly, I have questions
about whether the defendant truly has and whether the 105-month
recommendation is appropriate.  All of that, frankly, shows
this defendant not only is dangerous and violent, but has
refused, in front of this Court, to truly accept his role in

```
 1   this case.
 2              THE COURT:  Thank you.
 3         How do you wish to proceed?
 4              MR. CHERNIS:  I want to respond to that, Your Honor.
 5              THE COURT:  Look, we are not going to carry this on
 6   all day.  I see this case very different.
 7              MR. CHERNIS:  Your Honor, what Mr. Shiner just said
 8   is --
 9              THE COURT:  I see this case very different.  How do
10   you want to proceed?  Do you want to go forward today?  As a
11   technical matter, the revised PSR was produced on December 7th
12   and the addendum on that date also addressing your objections.
13   That being said, because of the Federal Rules of Criminal
14   Procedure require additional notice.  You can object to the
15   fact that you didn't get precise notice and we can put the
16   matter over and you can have additional time, or we can go
17   forward today.
18              MR. CHERNIS:  Mr. Barnett wishes to proceed,
19   Your Honor.
20              THE COURT:  Any final comments?  And then I will
21   hear from your client.
22              MR. CHERNIS:  Your Honor, I feel like I'm on
23   attack -- being attacked here.  A lot of what Mr. Shiner just
24   said is not accurate, an accurate representation of what I
25   wrote in my sentencing position.  We are not contesting -- we
```

```
 1   are not arguing innocence of the 2006 assault, and I wasn't in
 2   any way, shape or form seeking a minor role adjustment because
 3   he was the driver.  I was simply trying to make a point amongst
 4   a larger point.
 5        He did something 10 years ago.  It doesn't reflect a
 6   pattern of violence.  It's the only incident that's in the case
 7   where he's even close to violence.  The other incident that
 8   Mr. Shiner is now talking about, which I referenced in my
 9   supplemental, this 2013 attack, I read the Government's
10   position as saying Mr. Barnett brought guns to that event.
11        Now Mr. Shiner is saying that was not what the Government
12   was saying, that he wasn't trying to attribute it to Mr.
13   Barnett.  Fine.  But we're spending a lot of time talking about
14   a 2006 assault which happened a long time ago, Your Honor.  I
15   just want to emphasize that.  We are not minimizing that.  I'm
16   trying to put it in perspective that other defendants have done
17   far worse things more recently and have gotten lighter
18   sentences.
19        That's all I want to say, Your Honor.
20             THE COURT:  Look --
21             MR. CHERNIS:  And by the way, I didn't say the
22   Government had misled the Court.  What I said to Mr. Shiner
23   privately and in my supplemental was that the statements that
24   the Government made based on the original PSR had proven to be
25   inaccurate given the revised PSR, such as the fact that
```

1  Mr. Barnett did not merit a variance.  There was language,

2  Your Honor, in the original PSR that said that probation had

3  not identified any factors that would warrant a variance.  That

4  language was taken out of the revised PSR.

5           THE COURT:  Yes.  And just in reference to the claim

6  that your client has not led a life where violence was

7  regularly employed, that's inconsistent with -- that is

8  seemingly inconsistent with the plea agreement.  He's agreed

9  that from 2005 to 2014 he was a member of the Broadway Crips

10  and they would commit various acts of criminal acts.  He was a

11  member of the Gremlin Riders.  That's the enforcing group.  So

12  this claim that he did not lead a life of crime or violent

13  behavior I don't think is accurate.

14           MR. CHERNIS:  Your Honor, we are not disputing

15  what's in the plea agreement.

16           THE COURT:  Because you cannot.

17           MR. CHERNIS:  Of course not.  All I'm trying to say,

18  Your Honor, if you look at the other 70 defendants, including

19  many that you sentenced, were members of the Gremlin Riders.

20  They were much closer to guns and violence than Mr. Barnett was

21  personally.

22           THE COURT:  He was a driver in a case where he

23  was -- where there was an attempted murder.  There was total

24  disregard of life.

25           MR. CHERNIS:  Your Honor, I was --

```
 1              THE COURT:  And you're trying to -- you're making

 2    the argument that because he was a driver, he's less culpable.

 3              MR. CHERNIS:  Your Honor, that's not the argument

 4    I'm making.  I'm making the argument that it happened 10 years

 5    ago.  And I was in this courtroom when Your Honor sentenced

 6    another defendant who was a member of the Gremlin Riders, and

 7    Your Honor said, you know what --

 8              THE COURT:  Sir, every case is different, and the

 9    Court has to look at all of the factors.  Every case has its

10    unique factors.

11              MR. CHERNIS:  My client wants me to shut up, so I'll

12    shut up.

13              THE COURT:  Look, you're a vigorous advocate for

14    your client.  That's not a bad thing.  That's a good thing.

15    Let's go to your client and then we'll hear.

16         Yes, sir.

17              THE DEFENDANT:  I would like to thank the Court for

18    giving me the opportunity to speak.  I saw you once before when

19    I attempted to fire Mr. Chernis, and you told me he would fight

20    hard for me, and he has all the way through, and I appreciate

21    that.

22         I would like to apologize to my family and to my community

23    for the shameful acts I have committed over my lifetime.  I

24    make no excuses for my actions.  And I sincerely apologize to

25    the prosecution.  Everything that's been said, I agree to, and
```

1    I'm not disputing anything.  I'm just ready to move on with my

2    life.

3        I have a son that was born three months before I was

4    arrested on this indictment.  I seen his mother tell him,

5    "There's your father," and he looked around the courtroom and

6    he didn't know who I was.  I would just like to move on with my

7    life, sir, and try to put my life in perspective.

8        I've had a lot of time to think in the period of time of

9    fighting this case, and you don't realize the type of mistakes

10   that you've made in your life when no one around you is doing

11   right.  And over this period of time, I've got to reassess my

12   life and the things that I've done negatively and positively,

13   and I'm just ready for a change, sir.  So whatever you see fit,

14   I'm going to take that with a grain of salt and look to move

15   forward with my life.

16       Thank you.

17           THE COURT:  Thank you.

18       Well, those words are powerful words, so I'm hopeful that

19   they are heartfelt and you mean what you said.  And wanting to

20   focus on your son and your children are so important.  They

21   will look up to you in terms of, you know, where they go in

22   life.  So the good things that you do and the bad things that

23   you do will influence your children.

24       Anything further, Mr. Chernis?

25           MR. CHERNIS:  No, Your Honor.

1          THE COURT:  The Court has reviewed the addendum.

2   The addendum addresses the objections raised by Mr. Chernis in

3   the -- in his sentencing memorandum.  That being said, the

4   adjusted offense level is 31, not 32.  The Government has moved

5   for the additional point adjustment.  The defendant qualifies

6   as a career offender.  That places him in Criminal History

7   Category VI.

8          The defendant will be sentenced as follows:  It is ordered

9   that the defendant shall pay to the United States a special

10  assessment of $200 due immediately.  Unpaid balance shall be

11  paid during the period of imprisonment at the rate of not less

12  than $25 per quarter.  All fines are waived.  The defendant

13  does not have the ability to pay a fine.

14         Pursuant to the Sentencing Reform Act of 1984, it is the

15  judgment of the Court that Mr. Robert Curtis Barnett is hereby

16  committed on Counts One and Twelve of the first superseding

17  indictment to the custody of the Bureau of Prisons for a term

18  of 105 months.  The term consists of 105 months on Counts One

19  and Twelve.

20         Correct?  Just make sure that the max on both includes at

21  least 105 months.

22         105 months on Counts One and Twelve of the first

23  superseding indictment to be served concurrently.  The Court

24  would recommend -- based on the information contained in the

25  PSR, the Court would recommend that the Bureau of Prisons

1    conduct a mental health evaluation of defendant and provide all

2    necessary treatment.

3        Upon release, the defendant shall be placed on supervised

4    release for 5 years.  The term consists of 5 years on

5    Counts One and 5 years on Count Twelve to be run concurrently

6    under the following terms:  Comply with rules and regulations

7    of the probation office in General Order 05-02; not commit any

8    violation of local, state, federal law or ordinance; refrain

9    from unlawful use of a controlled substance; submit to one drug

10   test within 15 days of release and at least two periodic drug

11   tests, not to exceed eight tests per month; participate in

12   outpatient substance abuse treatment and counseling program

13   that includes urinalysis, breath and sweat-patch testing.  The

14   defendant will abstain from using alcohol, illicit drugs and

15   abusing prescription medication.

16       During the course of supervision, the probation officer,

17   with the agreement of defendant and defense counsel, may place

18   the defendant in a residential drug treatment program approved

19   by the probation office to treat the defendant's drug

20   dependency.

21       The defendant shall participate in mental health

22   treatment, which may include evaluation and counseling until

23   discharged by the treatment provider, with the approval of the

24   probation officer.  The defendant, during the period of

25   supervision, shall pay the special assessment in accordance

1    with the judgment orders of the Court.

2        When not employed or excused for schooling or other

3    acceptable reasons, the defendant shall perform 20 hours of

4    community service.  He shall not obtain or possess any driver's

5    license, social security number, birth certificate, passport or

6    any other form of identification in any name other than his

7    true legal name.  Cooperate in the collection of a DNA sample.

8        He shall not associate with anyone known by him to be a

9    member of the Broadway Crips gang and others known by him to be

10   participants in the Broadway Crips gang criminal activities,

11   with the exception of family members.  Not wear, display, use,

12   possess any gang insignias, emblems, badges, buttons, caps,

13   hats, jackets or any other clothing that the defendant knows

14   evidence affiliation with the Broadway Gangster Crips and may

15   not display any signs or gestures that defendant knows evidence

16   affiliation with the Broadway Gangster Crips.

17       He shall not be present in any area known by him to be a

18   location where the Broadway Gangster Crips regularly meet and

19   assemble.  And the defendant shall not reside in any BCG

20   territory without the express approval of the probation

21   officer.

22       The territory is defined as follows:  To the north, Vernon

23   Avenue; to the east, Avalon Boulevard; to the west, the 110

24   Freeway; and to the south, Slauson Avenue.

25       He shall submit his person, property, house, residence,

1    cell phone and vehicle to search at any time with or without

2    warrant by law enforcement or probation officer with or without

3    reasonable suspicion concerning a violation of a condition of

4    supervised release or unlawful conduct by the defendant and by

5    the probation officer in the lawful discharge of the probation

6    officer's supervision function.

7         The Court would authorize the probation office to disclose

8    the presentence report to the substance abuse treatment

9    provider to facilitate the defendants's treatment for narcotic

10   addiction.  Further redisclosure is prohibited without the

11   further order of the Court.

12        In sentencing the defendant, the Court has taken into

13   consideration the 3553 factors.  The sentencing imposed by the

14   Court recognizes the defendant's history of criminal conduct,

15   the history of violent criminal activity, his association with

16   the Gremlin Riders.

17        It also takes into consideration that at age 13 his family

18   was struck with a horrific catastrophe where his older brother,

19   who grew up in a different household and was a security guard,

20   was apparently killed in a shooting, and he has a life where

21   there has been abuse, neglect as a young person growing up.

22   That is very difficult.  So the Court has taken all of that

23   into consideration.

24        Any recommendations as to where he should be housed?

25             MR. CHERNIS:  California, Your Honor.

1          THE COURT:  California.  Southern California?

2          MR. CHERNIS:  Yes, but we are also seeking a

3   referral or recommendation for RDAP.

4          THE COURT:  Yes.  He should be -- the Court would

5   recommend the RDAP program, if he qualifies, and also a

6   facility in Southern California.

7       You have the right to appeal your sentence if you believe

8   your sentence is contrary to law or contrary to the plea

9   agreement.  It appears that you have waived your right to

10  appeal because the Court imposed a sentence that is -- wherein

11  it appears that you waived your right to appeal your sentence.

12  However, you have to discuss that with Mr. Chernis.  Any notice

13  of appeal must be filed within 14 days of today's date.

14      Motion?

15          MR. SHINER:  Yes, as to supervised release on

16  Count One, stat max is 3 years.

17          THE COURT:  The supervised release, then, will be

18  changed on Count One to 3 years, 5 years on Count Twelve, to be

19  run concurrently for a total term of 5 years.

20          MR. SHINER:  Yes.  And a motion to dismiss in the

21  underlying indictment the 851 information on the remaining

22  counts in the first superseding indictment.

23          THE COURT:  Yes.  The motion is granted.  Thank you.

24          (Proceedings concluded at 10:36 a.m.)

25                      --oOo--

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3      COUNTY OF LOS ANGELES    )
                                )
4      STATE OF CALIFORNIA      )

5

6             I, CAROL JEAN ZURBORG, Federal Official Realtime

7      Court Reporter, in and for the United States District Court for

8      the Central District of California, do hereby certify that

9      pursuant to Section 753, Title 28, United States Code that the

10     foregoing is a true and correct transcript of the

11     stenographically reported proceedings held in the

12     above-entitled matter and that the transcript page format is in

13     conformance with the regulations of the judicial conference of

14     the United States.

15

16     Date:  January 26, 2017

17

18

19                              /s/ CAROL JEAN ZURBORG

20                    _____
                      CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21                         Federal Official Court Reporter

22

23

24

25